Filed 10/6/23  P. v. Soto CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALEXANDER SOTO,<br><br>    Defendant and Appellant. | G061193<br><br>(Super. Ct. No. 10WF3109)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Andre Manssourian, Judge.  Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

Alexander Soto appeals from the order denying his petition for resentencing under former Penal Code section 1170.95.[1]  The trial court denied the petition after issuing an order to show cause and conducting a hearing.  Based on the court's review of Soto's original trial record and counsel's argument, the court concluded beyond a reasonable doubt Soto was guilty of second degree murder as a direct aider and abettor.  Soto seeks reversal of the order denying his petition on the grounds:  (1) an aider and abettor can only be convicted of murder upon a finding of express malice; and (2) even if an aider and abettor can be convicted of murder based on a finding of implied malice, insufficient evidence showed Soto acted with implied malice.

We affirm.  Pursuant to the California Supreme Court's recent decision in *People v. Reyes* (2023) 14 Cal.5th 981, 990 (*Reyes*), a defendant may directly aid and abet an implied malice murder.  As substantial evidence shows Soto acted with implied malice, the trial court did not err by denying Soto's petition.

FACTS

The following facts are taken from the factual and procedural background set forth in a prior opinion by another panel of this court in *People v. Soto* (Feb. 3, 2016, G049639, G050098, G050120) [nonpub. opn.], which Soto and the Attorney General have adopted as the statement of facts in their respective appellate briefs:[2]

"Harvey Romero, the victim, accompanied several friends to a party before it was broken up by police.  Harvey left the party with his cousin, Anthony Romero, and

---

[1]  Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6 with no change in text.  (Stats. 2022, ch. 58, § 10.)  All further statutory references are to the Penal Code.

[2]  The term "defendants" as used in this summary of facts refers to Soto and his two codefendants at trial, David Anthony Luna and Jeremy Erin Valdez.

three others.[3]  Isidro Martinez drove, with Vanessa Bruno sitting next to him in the front seat, and Harvey sat in the back seat by a window.  Anthony and his girlfriend, Kaylin Allbee, also sat in the back seat.  The group set out in search of another partygoer who already had left, Chloe Cruz, and wound up on Santa Catalina Street in Stanton, an area the Crow Village criminal street gang claimed as its territory.

"Unfamiliar with the neighborhood, the group remained in touch with Cruz by cell phone.  As they looked for her, Martinez drove slowly in his gray SUV past several men standing in the street, including the three defendants, Jorge Huante, and two others.  Defendants and Huante belonged to the Crow Village gang.

"Earlier in the evening, a neighbor had heard Huante announce to defendants and another male that he had his '.38' with him.  The neighbor, fearing violence, declined to give Huante a ride to a party that night and ultimately decided not to go to the party.  But now Huante and the others had returned and gathered in the street.

"Meanwhile, as Harvey and his friends drove by looking for Cruz, the Crow Village group approached their vehicle, with Huante and Soto leading the way, trailed by Luna and another man.  One of the four called out to Martinez's vehicle, 'Where are the girls at?'  Anthony tried to deflect the question, saying there were none, and Martinez continued driving, but the four men kept alongside on foot.

"Huante and Soto each called out at the vehicle, 'Where are you from,' or 'Where do you bang,' which Anthony understood meant 'What gang are you with?' Anthony, who did not belong to a gang, felt the encounter was escalating and declined to respond, though he and Huante 'mad dogg[ed]' each other, which he explained meant, 'Like when I'm looking at somebody in a mean way.'  Luna and the other man trailing

---

[3]  "For ease of reference, we use Harvey's and Anthony's first names to differentiate between the two cousins."

Huante and Soto began making gang hand signs at the SUV and calling out their gang's name.

"According to one witness, Valdez stood nearby and stepped out into the street in the direction the SUV was traveling, as if to stop it.

"Someone in the Crow Village group yelled at the SUV, 'You know where you're at,' and Huante declared, 'It's Crow Village.' According to a witness from the neighborhood, someone from the SUV retorted, 'Fuck this neighborhood.'

"As Martinez began to turn at the nearest intersection, Harvey leaned his head out the window and gunfire immediately rang out. He and Allbee collapsed in the back seat. Allbee confirmed she was okay, but when Anthony tried to lift Harvey, he was limp and heavy. Anthony's hands grew very warm and he realized Harvey was bleeding profusely from his face. At some point in the confrontation and commotion, Anthony saw Huante holding a gun. Another witness in the neighborhood also saw Huante pull out and fire the gun.

"Martinez sped away to find a hospital, but spotted Orange County Sheriff Department deputies conducting an unrelated traffic stop, so Martinez pulled over for help. Back at the shooting scene, Huante, Soto, and Valdez (but not Luna) had jumped into Yosep Palacio's black SUV. Valdez's girlfriend, Brianna Casanovo, already was in the car, and so was Cruz, whom Martinez's group had been trying to find.

"Palacio drove off and happened to pass where Martinez had stopped to ask the sheriff's deputies for help. Martinez noticed the black SUV approaching and told one of the deputies, Peter Mach, that it looked like a vehicle he saw at the shooting scene. As the vehicle passed, Mach thought he recognized Huante from prior police contacts.

"A nearby deputy gave chase, but Palacio did not stop immediately. He ultimately pulled into the back of a church parking lot, where Huante and Valdez exited the vehicle and scaled a wall. Valdez hid in a ditch, then ran back to his residence, showered, changed his clothes, and called a Crow Village neighbor to visit around

4

11:00 p.m. He told the neighbor of his escape after being pulled over, but as he drew a diagram of the area where the stop occurred and showed it to his neighbor, the police arrived and apprehended him.

"Harvey was transported to the hospital, but died of his injuries, which included a fractured skull from the gun shot, blood loss, and brain hemorrhaging.

"Police surveillance of a Westminster home led officers to Huante the next evening, but he escaped in a Mustang driven by a female accomplice, who briefly eluded police twice. When the officers pulled the vehicle over, Huante was gone and remained at large at the time of trial. A phone recovered from the Mustang bore traces of Huante's DNA.

"A car wash employee found a gun in the bushes near the church where Palacio had been stopped. The gun, a five-shot revolver, contained four live rounds and one fired cartridge casing. Although the ammunition in the gun was not designed for it, the gun still could fire those rounds. The gun ordinarily required special .38-caliber ammunition, but contained other .38-caliber bullets made by Smith and Wesson, which matched a fragment recovered from Harvey's wound.

"Forensic analysis of the recovered gun showed DNA traces of at least three individuals on the grip and hammer, and at least four individuals on the trigger. The DNA samples were not suitable to make a positive identification, but Huante, Palacio[], and defendants Valdez and Luna were possible contributors to the DNA mixture on the gun grip. Huante and defendants Valdez and Luna were also possible DNA contributors on the trigger. The testing excluded defendant Soto as a contributor on the grip or trigger.

"Within a week of the shooting, new graffiti at the intersection where Harvey was killed made reference to Crow Village and to Soto's and Huante's gang monikers.

5

"Valdez's former girlfriend, Brianna Casanova, testified Valdez stood by a wall talking to a group of women at the time of the shooting. After she heard gun fire, Valdez joined her in Palacio's car and they drove away to go to a party.

"Luna's cousins and friends testified that he was at a birthday party at the time of the shooting. Soto's father and mother claimed for the first time at trial that he was home at the time of the shooting.

"Bruno testified for the defense that Allbee, Anthony's girlfriend, directed Martinez where to go in Stanton to get drugs. As they drove slowly through the neighborhood, she saw between seven and 10 males nearby, and she heard the questions about whether there were any girls in the car and "where are you from?" According to Bruno, she heard two gun shots separated by a couple of seconds. None of the shots came from inside Martinez's vehicle.

"The defense also called Allbee, and when she remembered little, refreshed her recollection with her statement to an investigator that she heard two gun shots."

PROCEDURAL HISTORY

In 2013, a jury convicted Soto of second degree murder. (§ 187, subd. (a).) The jury also convicted Soto of active participation in a criminal street gang (§ 186.22, subd. (a)) and shooting at an occupied motor vehicle (§ 246), and found various penalty enhancement allegations true, including that he committed the murder to promote the activities of a criminal street gang (§ 190.2, subd. (a)(22)),[4] vicariously discharged a firearm causing death (§ 12022.53, subds. (d), (e)(1)), and committed the offenses for the

_____

[4] The trial court struck this enhancement, stating in the minutes: "By operation of law, the Enhancement alleged pursuant to Penal Code section 190.2 applies only to convictions of First Degree Murder. Defendant was convicted of Second Degree Murder." Both parties and the trial court agreed the jury's true finding on this enhancement should not be considered in the resolution of Soto's petition for resentencing.

benefit of a criminal street gang (§ 186.22, subd. (b)).[5] The trial court sentenced Soto to an aggregate term of 40 years to life.

Soto appealed from the judgment of conviction. In February 2016, a panel of this court affirmed the judgment of conviction, rejecting Soto's arguments regarding the sufficiency of the evidence, instructional error, and ineffective assistance of counsel. (*People v. Soto, supra*, G049639, G050098, G050120.)

In 2018, the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) which limited accomplice liability under the felony murder rule and the natural and probable consequences doctrine by amending sections 188 and 189. (See *People v. Cruz* (2020) 46 Cal.App.5th 740, 755; *People v. Solis* (2020) 46 Cal.App.5th 762, 768.) It also implemented a process in former section 1170.95 (now section 1172.6) whereby persons previously convicted of felony murder or murder under a natural and probable consequences theory could petition the superior court to vacate their murder convictions and for resentencing. (*People v. Cruz, supra*, 46 Cal.App.5th at p. 753.)

In April 2019, Soto filed a petition for resentencing under former section 1170.95. (*People v. Soto* (Aug. 4, 2020, G058078) [nonpub. opn.].) The petition alleged he was convicted of second degree murder under the natural and probable consequences doctrine, and that under Senate Bill No. 1437 he could not now be convicted of murder. (*People v. Soto, supra*, G058078.)

The trial court denied the petition on the sole basis Senate Bill No. 1437 was unconstitutional because it improperly amended Propositions 7 and 115. (*People v. Soto, supra*, G058078).) A panel of this court reversed the trial court's order and directed the trial court to consider the merits of Soto's petition. (*Ibid.*)[6]

---

[5] The jury also convicted Luna and Valdez of the same offenses. Since Luna and Valdez are not parties to this appeal, we reference them only to provide relevant background.

[6] In the opinion, this court explained: "In two recently published opinions, this court concluded Sen. Bill 1437 is constitutional because it neither adds any particular provision

Following remand to the trial court, the prosecution conceded the petition made a prima facie showing Soto was entitled to relief and the trial court issued an order to show cause on the petition. The parties filed supplemental briefs and presented argument at the hearing; no additional evidence was presented at the hearing on the petition. The trial court thereafter denied the petition, stating in the court minutes: "The People have proven to this court beyond a reasonable doubt that Mr. Soto's conviction is valid under a still-viable theory of liability." Soto appealed.[7]

## DISCUSSION

### I.

#### SENATE BILL NO. 1437 AND THE SECTION 1172.6 PETITION PROCEDURE

Senate Bill No. 1437 amended the felony murder rule and eliminated the natural and probable consequences doctrine for murder "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1(f).) One of the changes it made was amending section 188, which defines malice. As amended, section 188 states, except for felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) This amendment effectively eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder. (*People v. Gentile* (2020) 10 Cal.5th 830, 846–848, abrogated by statute on

---

to nor subtracts any particular provision from either Proposition 7 or Proposition 115. [Citations.] We decline to revisit those decisions." (*People v. Soto, supra*, G058078.)

[7] During the pendency of this appeal, the California Supreme Court issued its decision in *Reyes, supra*, 14 Cal.5th 980. We invited the parties to file supplemental letter briefs addressing the impact of the *Reyes* decision on this appeal; Soto and the Attorney General each did so.

another ground as stated in *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 591, review granted Jan. 27, 2022, S274792, review dism. May 31, 2023.)[8]

With Senate Bill No. 1437, the Legislature also created a process through which defendants convicted of felony murder or murder via a natural and probable consequences theory under the former law could petition the superior court to have their murder convictions vacated pursuant to the new law. (Stats. 2018, ch. 1015, § 4; *People v. Strong* (2022) 13 Cal.5th 698, 708.)

The process begins when a defendant, who was previously convicted of murder under a qualifying theory, files a petition, which includes a declaration by the defendant that he or she is eligible for relief under section 1172.6 based on the statute's requirements. (§ 1172.6, subd. (b)(1)(A).) Once a defendant has made a prima facie showing for entitlement to relief, the court must issue an order to show cause. (§ 1172.6, subd. (c); *People v. Strong, supra*, 13 Cal.5th at p. 708.)

Unless the parties stipulate the defendant is eligible for relief under the statute, the court must hold a hearing to determine whether the defendant should be granted relief. (§ 1172.6, subd. (d)(1), (2).) At the hearing, the prosecution bears the burden of proving beyond a reasonable doubt the defendant is guilty of murder under the law as amended by Senate Bill No. 1437. (§ 1172.6, subd. (d)(3).) "[T]he court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (*Ibid.*) Both parties may present "new or additional evidence to meet their respective burdens." (*Ibid.*) If the court finds beyond a reasonable doubt the defendant is guilty of murder under the law as amended by Senate Bill No. 1437, the petition is denied. However, "[i]f the prosecution fails to sustain its burden of proof, the

---

[8] While Senate Bill No. 1437 also amended the felony murder rule (Stats. 2018, ch. 1015, § 3), we need not discuss those changes here as the felony murder rule is not at issue in this case.

prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).)

## II.

### STANDARD OF REVIEW

"Ordinarily, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ""'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'"" [Citation.] But where there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*Reyes, supra*, 14 Cal.5th at p. 988.)

## III.

### THE RECORD DOES NOT SHOW THE TRIAL COURT MISAPPREHENDED THE APPLICABLE LEGAL PRINCIPLES AND ELEMENTS FOR AIDING AND ABETTING IMPLIED MALICE MURDER

At trial, the prosecution relied on two theories of aiding and abetting to establish Soto's liability for murder. After conceding Soto was not the shooter, the prosecutor informed the jury it could find Soto (and his codefendants) guilty of second degree murder under a theory of direct aiding and abetting or under the natural and probable consequence doctrine. Because Senate Bill No. 1437 eliminated the latter theory, we examine whether the trial court properly understood the elements of direct aiding and abetting. (See *Reyes, supra*, 14 Cal.5th at p. 990.)

In his opening brief, Soto argues as an aider and abettor he could only be convicted of murder upon a finding of express malice. In *Reyes, supra*, 14 Cal.5th at page 990, however, the California Supreme Court stated case law has recognized and

applied the direct aiding and abetting theory of second degree murder "and we see no basis to abrogate it." (*Id.* at p. 990.) The Supreme Court explained: "In *Gentile*, we observed that 'notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.' [Citation.] Since our decision in *Gentile*, the Courts of Appeal have held that a defendant may directly aid and abet an implied malice murder." (*Ibid.*)

Citing *People v. Powell* (2021) 63 Cal.App.5th 689, 710–714, the Supreme Court in *Reyes* stated: "'[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*Reyes, supra*, 14 Cal.5th at pp. 990–991.)[9]

---

[9] The California Supreme Court further explained: "'The reason why there is a dearth of decisional law on aiding and abetting implied malice murder may be the heretofore availability of the natural and probable consequences doctrine for second degree murder, which was easier to prove. . . . [T]he natural and probable consequences doctrine did not require that the aider and abettor intend to aid the perpetrator in committing a life-endangering act . . . . What was natural and probable was judged by an objective standard and it was enough that murder was a reasonably foreseeable consequence of the crime aided and abetted.'" (*Reyes, supra*, 14 Cal.5th at p. 991.)

11

As pointed out by the Attorney General in his supplemental letter brief, nothing in the record suggests the trial court misapprehended the applicable legal principles or required elements for aiding and abetting implied malice murder in ruling on the petition. We therefore consider Soto's arguments regarding the sufficiency of the evidence.

IV.

SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S FINDING SOTO IS GUILTY OF SECOND DEGREE MURDER AS A DIRECT AIDER AND ABETTOR.

Soto argues that even if his second degree murder conviction based on an implied malice aiding and abetting theory is valid, his petition should have been granted because insufficient evidence shows Soto acted with implied malice. We disagree.

As we will explain, substantial evidence showed Soto, by words and conduct, aided the commission of the life-endangering act of Huante shooting at the SUV. (See *Reyes, supra*, 14 Cal.5th at p. 991.) Substantial evidence also showed Soto knew Huante intended to commit the shooting, intended to aid Huante in the commission of that act, knew the act of shooting at an occupied vehicle is dangerous to human life, and acted in conscious disregard for human life. (See *ibid.*)

Trial testimony showed on the night of the shooting, Soto was gathered with fellow Crow Village criminal street gang members in an area claimed by that gang when Huante, also a member of Crow Village, showed Soto and the others he had a gun, telling them: "'I got a .38.'" After displaying the gun to the group for about a minute, Huante put the gun in his waistband. When the SUV turned onto the street where Soto and the other Crow Village gang members were gathered, Soto and Huante approached the SUV; Valdez jumped in front of it trying to stop its forward progress. Huante thereafter initiated a "hit-up" by asking the occupants of the SUV where they were from.

The prosecution's expert gang witness testified: "A hit-up is basically a challenge, a verbal challenge, where are you from, where do you bang, things of that

12

nature.  There is not necessarily any right or wrong answer, but when you say where are you from, where do you bang, it's basically a challenge to see if you're a gang member, if you're a rival of that gang, or an ally of that gang, and trying to figure out who you are in a very small amount of time.  If you're deemed a rival, then immediate reaction is they have to fight you.  If you – if the gang member perceives you gave the wrong answer, they will, at the very least, assault you."

The expert witness explained "respect is everything in the gang world" and "[d]isrespect requires immediate retaliation."  He also testified that it was common within gang culture that a "wrong" response, e.g., a disrespectful response, will escalate into an attempted murder or murder.  He stated:  "Again, it goes back to the sign of disrespect and also the possible wrong answer to where are you from.  If you don't, if they see you as a challenge or a threat, they have to do something, the gang member has to do something right then and there, even if it's a normal tone, they don't like their answer, they are going to be assaulted."

He also explained how gang members back each other up:  "If, say, there is one person in a group that's hitting up another person, there are several subjects behind him backing up.  If that front person is disrespected, then the people in the background, the backup, don't do something about it, then they are losing respect also."

Evidence presented at trial shows Soto did not just accompany Huante in hitting up the occupants of the vehicle, he also participated directly in hitting them up, asking them where they were from and flashing gang signs, and as Huante's backup.  After Huante and Anthony had mad-dogged each other and Huante declared they were "in Crow Village," someone in the SUV gave a wrong answer, stating "Fuck this neighborhood."  Moments later, Huante pulled out the gun and fatally shot Harvey.

Substantial evidence therefore supports the trial court's findings.  The trial court did not err by denying Soto's petition for resentencing.

13

## DISPOSITION

The postjudgment order denying Soto's petition for resentencing under section 1172.6 is affirmed.


MOTOIKE, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.